Filed 11/20/20  P. v. Williams CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MARCUS D. WILLIAMS,<br><br>        Defendant and Appellant. | C090246<br><br>(Super. Ct. No. 18FE001615) |

A jury found defendant Marcus D. Williams guilty of assault with a semiautomatic pistol and unlawful possession of a firearm, and found true defendant personally used a firearm during the commission of the assault.  The trial court further found true a prior strike allegation.  Defendant was sentenced to 27 years to life plus a consecutive 14 years.

On appeal, defendant raises several ineffective assistance of counsel arguments, argues the trial court erred in finding his prior juvenile conviction constituted a strike,

1

and asserts his one-year enhancement under Penal Code[1] section 667.5 must be stricken. He further asserts the cumulative effect of the errors in this case deprived him of due process and his right to a fair trial. The People concede the one-year enhancement must be stricken because it was dismissed prior to judgment but assert defendant's remaining contentions have no merit.

We accept the People's concession and strike the one-year enhancement. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We summarize the trial evidence regarding the shooting and investigation here and provide further factual detail pertaining to defendant's arguments in the pertinent portions of the discussion, as necessary.

At around 10:00 p.m. on January 26, 2018, F. S. ran out of gas while driving home. He pulled a bicycle from the back of his truck and started pedaling toward his neighborhood. F. S. was riding his bicycle on 64th or 65th Avenue in Sacramento. Although that evening was a blur for F. S. because he was depressed and under the influence of alcohol, F. S. recalled a big car "pulled up on [him]" as he was riding his bicycle home. The car then "reversed and started following [him]" in reverse. At some point the car turned around and continued following him. F. S. saw a flash and heard gunshots "hitting stuff around [him]." F. S. fell off his bicycle and ran away. He ultimately ran into an open garage, where he got into a physical altercation with a male resident who thought F. S. was an intruder; the person forced F. S. to sit on the ground and wait for the police. F. S. did not know who was driving the car that followed him and he had never seen defendant prior to trial.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

Sacramento Police Officer Derek Calabrese[2] picked up F. S. on 63rd Avenue that evening and drove him home. On the way, F. S. identified a blue Chevy Tahoe parked in the driveway of a house on 15th Street as the car that chased him earlier that evening. F. S. further told Officer Calabrese that the Chevy Tahoe had hit another vehicle at some point during the incident. Officer Calabrese saw police vehicles at the home on 15th Street; at that point, he believed the officers were investigating an unrelated incident.

The 15th Street address was defendant's mother's house, where defendant lived. Earlier that evening, defendant had borrowed his mother's blue Chevy Tahoe. Defendant, accompanied by his girlfriend, S. T., returned the car about an hour later with damage to the front panel on the passenger's side; defendant told his mother he had hit another car or another car had hit him (his mother could not recall). Defendant's mother was upset and called 911 to report the accident.

Sacramento Police Officer Jyotis Hasegawa responded to the 911 call. Defendant's mother told Officer Hasegawa that defendant was possibly on drugs and had a weapon. Officer Hasegawa searched the Chevy Tahoe parked in the driveway and found an empty casing from a "45 auto" bullet on the front passenger floorboard. He contacted Sacramento Police Officer Robert Hamm, who was investigating the incident involving F. S., and told Officer Hamm that he had possibly found the car involved in the alleged shooting.

Prior to the phone call, Officer Hamm was at a house on 65th Avenue, where a damaged vehicle confirmed F. S.'s statement that an accident had occurred. Officer Hamm also found a bicycle, which F. S. said belonged to him. Officer Hamm searched the 65th Avenue area for evidence of a shooting but found none.

---

[2]     It appears the officer misspoke when he testified he picked up F. S. on 63rd Street.

Officer Hamm went to defendant's mother's house, which was approximately two to three blocks away from the 65th Avenue location. There, he found a "live" .45-caliber bullet in the driveway. Officer Hamm was accompanied by Sacramento Police Officer Michael Novak.

Officer Novak spoke with S. T. at defendant's mother's house; S. T.'s statement was recorded on Officer Novak's body-worn camera. Officer Novak testified S. T. was visibly upset and appeared to be scared, asking several times whether she could remain anonymous and looking over her shoulder because she was afraid defendant was listening to their conversation. Officer Novak's body-worn camera footage was played for the jury.

In her statement to Officer Novak, S. T. said she was driving with defendant when they saw a man in a truck looking at them. Defendant drove past the man and turned around. The man got out of his truck, grabbed a bicycle, and began pedaling away. Defendant put the car in reverse to "catch him." Defendant then turned the car around, told S. T. to move out of the way, shot at the man across S. T.'s body, and drove into a camper. S. T. saw the man limping and she thought he had been shot. Defendant drove off and told S. T. to tell his mother that someone had hit them. When S. T. and defendant arrived at defendant's mother's house, defendant took a shower. Defendant took the gun into the bathroom with him and later moved the gun into the kitchen. S. T. said she believed "the guy we shot at" was going to kill them and that he had a gun.

S. T. directed Officer Novak to a loaded gun on top of the refrigerator. The gun was a .45-caliber, high-point semiautomatic handgun containing seven .45-caliber rounds in the magazine and one .45-caliber round in the chamber. The spent casing found in the car and the live round found on the driveway were both "Sig 45 autos," the same as the rounds found in the gun.

A police officer performed a gunshot residue test on defendant at his mother's house. The test revealed a few particles consistent with gunshot residue on defendant's

4

hands, which, according to a forensic expert, was consistent with someone firing a gun, taking a shower, and then picking up a gun and moving it.

DISCUSSION

I

*Defendant Fails To Show Ineffective Assistance Of Counsel Pertaining*

*To S. T.'s Testimony And Her Prior Statement To Police*

Defendant asserts his trial counsel was ineffective for failing to raise inadmissible character evidence objections to S. T.'s trial testimony affirming she had previously told the police that defendant smoked methamphetamine and was paranoid all the time prior to the crime and she saw defendant carrying a handgun around the house while " 'tripping on meth.' " He further asserts that, although S. T.'s testimony that defendant had committed prior acts of domestic violence against her "may arguably have been relevant to her credibility," his counsel was ineffective for failing to seek an appropriate limiting instruction. He believes his trial counsel was additionally ineffective for failing to assert inadmissible hearsay and character evidence objections to the portion of S. T.'s recorded police statement in which S. T. said defendant had previously possessed and used a gun. Also as to S. T.'s recorded statement, defendant argues his counsel was ineffective for failing to object to the inflammatory evidence of his prior acts of domestic violence and failing to seek a limiting instruction.

A criminal defendant asserting his or her lawyer failed to deliver what the Constitution promises bears the burden of proving the attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that it is reasonably likely the result would have been different if the attorney's performance was up to par. (S*trickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693].) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or there could be no satisfactory explanation for

5

counsel's performance." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)  We presume " 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' "  (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

We conclude defendant did not receive ineffective assistance of counsel.  His counsel's actions and inactions can be explained as a matter of trial strategy.

## A

### *Background*

#### 1

##### *S. T.'s Testimony*

S. T. testified she started dating defendant in August or September 2017.  Their relationship was rocky around the end of 2017 or beginning of 2018 because S. T. believed defendant was unfaithful and disrespectful.  S. T. said "[they] had like some physical stuff" such as "fighting, throwing stuff at each other, just being crazy."  When asked if defendant hit her, S. T. responded:  "I wouldn't say hit me, but, like, you know, just might be physical, like try to restrain me or something like that."

On January 26, 2018, defendant picked up S. T. from her apartment at some point in the evening.  S. T. generally recalled getting into defendant's car and driving to defendant's mother's house.  She could not recall the specifics of what happened that evening because she "was on drugs and drinking all the time."  Specifically, S. T. could not recall seeing a bicycle, seeing someone in another car, or speaking with police officers.  When the prosecution asked S. T. whether she remembered talking to police officers that day, she responded:  "No.  I know that the -- all these things happened, because obviously, you know, there is a police report and everything like that, but me, like, having a conversation, what I said, where my head was at, I can't tell you.  I don't know.  I don't remember."

6

Pertinent to defendant's arguments, the following exchange then occurred:

"Q  So do you remember telling the officer you had been dating [defendant] for about five months now?

"A  I probably did say that, because that would have been approximately true around the time.

"Q  And that ever since you started dating him you have known that he has been smoking meth and is really paranoid all the time?

"A  Yep.

"Q  And that also when you started dating him you would see him carry a handgun around the house, but you thought it was just because he was tripping on meth?

"A  Probably.

"Q  And that you had been trying to get out of the relationship for a little while now and have been becoming more and more terrified because of his actions?

"[DEFENSE COUNSEL]:  Objection, this is leading.

"THE COURT:  Overruled.  I'll allow it as a hostile witness.

"THE WITNESS:  Like I said.  I don't remember.  I know at that point in time I was trying to get away from him.  I was mad at him for different things.  So I could have said anything, and I was high myself and paranoid all the time."

Following this testimony, S. T. answered further questions presented by the prosecution regarding her police statement.  Defense counsel objected that S. T. was "speculating as to what the responses are."  The trial court admonished S. T., "[t]he question is did you say these things."  S. T. responded, "I know I must have said them because they are on the report.  Do I remember saying them?  No."  Thereafter, S. T. responded, "I don't remember" or "I don't recall" or a variation of the foregoing, to the remaining questions regarding her police statement.  The remaining questions included whether S. T. told the police officer:  (1) defendant told S. T. he was her pimp and she needed to pay him what he was owed; (2) defendant always threatened her "with sending

7

all of his boys and bitches on [her]"; (3) defendant previously choked her; (4) defendant previously dragged her by the hair; and (5) defendant left her threatening voice mails.

On cross-examination, defense counsel asked S. T. whether she had any memory of speaking to the police that evening or making the statements the prosecution had read to her. S. T. said she did not. Defense counsel asked S. T., "[h]ow would you describe your state of mind back on the day that this all happened?" S. T. responded: "I wasn't -- I don't -- I wasn't stable, because I was all over the place, and I was staying up all night and then going to work high, and -- you know what I mean? Like just I wasn't in my right mind."

On redirect examination, the prosecution asked S. T.: "you told the officers that [defendant] had beat you up you don't know how many times and called you things like a whore?" She responded: "Yeah, I guess." The prosecutor then asked: "And he put a knife to your throat?" S. T. responded: "I don't remember him putting a knife to my throat." The prosecutor further asked: "And you told the officers that all you can say is if this shit is on paperwork you are dead, my kids and my mom are in danger?" S. T. responded: "I don't remember saying that."

On recross-examination, defense counsel asked S. T. whether she had previously made false claims against an ex-boyfriend; S. T. responded she had, and the man was charged with a crime, but the charges were later dismissed.

2

*S. T.'s Police Statement*

Following S. T.'s testimony, the recording of her statement to Officer Novak was played in its entirety. Pertinent to defendant's arguments, in that recording, S. T. said: defendant "shot out" a sliding glass door with a gun a few months prior; defendant told her he had another gun; defendant previously threw a gun "at the roof over [S. T.'s] house" to hide it from the police and defendant later retrieved it; and defendant told her "he shot somebody" previously. S. T. further told Officer Novak: defendant put a note

8

on her door stating, " 'You need to come see me today by 10 o'clock. If you don't, it's gonna be a problem. That's how women and kids,' you know, 'innocent people get hurt' "; defendant previously stabbed her tires; she once had a temporary restraining order against defendant; and defendant would chase her car if she did not pull over upon his demand and "we done been like high speed chases."

3

*Defense's Closing Argument*

During closing argument, defense counsel attacked S. T.'s police statement on several grounds. Defense counsel focused on S. T.'s demeanor in the recording, which the jury observed, suggesting she was under the influence when she made the statements, and pointing out S. T. testified that, at the time she gave the statements, she suffered from anxiety and depression, used large amounts of alcohol to medicate herself, and used methamphetamine, ecstasy, methadone, or any other drug she could find to make herself feel better. He noted defendant's mother testified S. T. "was out of her head" and "all over the place."

Defense counsel also argued S. T.'s statements revealed she was paranoid and hallucinating, and S. T. had a motive to lie when she made the statement because she was angry with defendant for leaving her voice mails of him having sex with other women.

As to S. T.'s domestic violence statements, defense counsel argued: "[The prosecutor] talked about this is a domestic violence issue and all of those things. Well, obviously in these times those catch phrases are inflammatory, no question. They are not right, that conduct, no doubt. But this is not morality court. This is not whether you like somebody. It's whether these charges, these specific charges, have been proved. And you hear[d] [S. T.] go through over a third of the interview talking about all this stuff. Dudes down the street, this history of violence. She talks about I called the police before and they came and they arrested him, but he got let go, and the officers talk about, well, that's a bummer and all these different things. She is making this stuff up."

9

Defense counsel further argued S. T.'s testimony at trial was that she had no memory of the night she gave the statements to the police and "all she could tell you as she sits here today honestly is I don't remember any of that." He said S. T. "pieced some things together, as she told you, based on her review of some reports, but she has no memory of that night."

B

*The Record Reveals Trial Counsel Had A Strategy And Made Tactical Decisions*

We collectively address defendant's first two ineffective assistance of counsel arguments regarding S. T.'s testimony pertaining to her prior statements to police that defendant used methamphetamine and was paranoid, and she had observed him carrying a gun around the house while " 'tripping on meth.' " Defendant finds it inconceivable that any competent lawyer would fail to object to the foregoing portions of S. T.'s testimony. We find no merit in this argument.

We surmise defense counsel's strategy in dealing with S. T.'s testimony was twofold. First, counsel elicited from S. T. that her affirmative responses to the prosecution's questions regarding her prior police statement were *all* in error because, as counsel said in closing argument, S. T. had "no memory of that night." Thus, S. T. could neither confirm nor deny at trial what she had told the police that evening. Second, defense counsel sought to discredit S. T.'s statements to the police *as a whole* by suggesting S. T. was under the influence, paranoid, and hallucinating when she gave the statements, and focusing on her lack of credibility, bias, and motive to lie. Defense counsel painted S. T. as a liar and a vindictive person willing to falsely accuse another of a crime at the time she spoke to the police. We deduce counsel sought not to draw attention to S. T.'s specific statements to the police by objecting to the individual questions.

"The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." (*People v. Frierson* (1991) 53 Cal.3d 730, 749.) "Hindsight is

10

'highly deferential.' [Citation.] 'In evaluating defendant's showing we accord great deference to the tactical decisions of trial counsel in order to avoid "second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel to 'defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . .' " ' " (*People v. Padilla* (1995) 11 Cal.4th 891, 936.) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) Here, the record reveals a tactical reason for not objecting to S. T.'s challenged testimony.

Defendant's third claim of ineffective assistance of counsel centers on S. T.'s testimony pertaining to defendant's prior acts of domestic violence. Defendant argues S. T. "testified that [defendant] had beaten her up multiple times, he called her names, flaunted his unfaithfulness, and engaged in mutual violence with her." He concedes "her testimony regarding her relationship with [defendant], and whether she had been subjected to prior violence at his hands, was relevant" because S. T. had, in effect, recanted her prior statements to the police, which inculpated defendant. Defendant's claim of error is that his counsel failed to seek a limiting instruction as to this testimony, and, in his view, there was no tactical or strategic reason for failing to do so. We disagree.

Defendant misstates the scope of S. T.'s testimony. S. T. did not testify that defendant "had beaten her up multiple times" or "called her names." S. T. answered "[y]eah, I guess" when asked whether she *told the officers* that [defendant] had beat you up you don't know how many times and called you things like a whore." (Italics added.) As explained *ante*, the record reveals defense counsel had a strategy in dealing with S. T.'s testimony regarding her prior police statement. During closing argument, defense counsel specifically addressed S. T.'s domestic violence statements to police, stating

11

"[s]he's making this stuff up." Defense counsel may have reasonably considered a limiting instruction as to this portion of S. T.'s testimony inconsistent with the defense's theory that none of her statements to the police were truthful.

As to S. T.'s testimony that defendant "flaunted his unfaithfulness, and engaged in mutual violence with her," even assuming a limiting instruction would have been justified (which we need not and do not decide), counsel could have reasonably believed a limiting instruction would have added little to the jury's understanding of the case and would have done more harm than good by directing the jury to focus on S. T.'s testimony. (See *People v. Ferraez* (2003) 112 Cal.App.4th 925, 934 [no ineffective assistance of counsel because "a limiting instruction would have added little to the jury's understanding of the case [and] the decision not to request one was a reasonable tactical choice by defense counsel to avoid directing the jury to focus on the evidence"]; *People v. Maury* (2003) 30 Cal.4th 342, 394 ["A reasonable attorney may have tactically concluded that the risk of a limiting instruction . . . outweighed the questionable benefits such instruction would provide"].) We thus conclude defendant's trial counsel was not ineffective for failing to request a limiting instruction as to this testimony.

We collectively address defendant's fourth and fifth claims of ineffective assistance of counsel regarding S. T.'s recorded police statement, in which she said: (a) defendant previously possessed and discharged a gun and admitted to her that he had shot someone, and (b) defendant committed numerous acts of domestic violence against her. Assuming the objections and limiting instruction were warranted as defendant asserts (which we need not and do not decide), defendant did not receive ineffective assistance of counsel because the record reveals defense counsel had a tactical reason for not objecting or requesting a limiting instruction as to the recording, for the same reasons discussed *ante*. The strategy was to discredit S. T.'s entire police statement. We thus conclude defense counsel was not ineffective for failing to object or request a limiting instruction as to the challenged portions of the recording.

12

## II

### *Defendant Fails To Show Ineffective Assistance Of Counsel Pertaining To The Gunshot Residue Report And Testimony*

Defendant argues his trial counsel was ineffective for failing to raise hearsay objections to the admissibility of the gunshot residue report and the expert's testimony establishing particles consistent with gunshot residue found on defendant's hands. He asserts the testing report was testimonial because it was prepared with the requisite formality and had the primary purpose of accusing a targeted individual of engaging in criminal conduct. He further believes the expert's testimony that the gunshot residue results " 'purported to' " relate to defendant was case-specific hearsay, as found inadmissible in *People v. Sanchez* (2016) 63 Cal.4th 665, given the expert did not have personal knowledge relating to the facts. Defendant claims he was prejudiced by his trial counsel's failure to object to the admissibility of this evidence because the evidence "corroborated [S. T.'s] recorded statement that [defendant] took a shower after the shooting and then hid the gun" and the prosecution relied on the gunshot residue test results several times during closing argument. Accordingly, defendant asserts there is a reasonable probability the outcome would have been different if his counsel had raised the hearsay objections.

The People argue defendant "cannot establish that his counsel's representation was deficient because counsel failed to object," and, even if his counsel's representation was deficient, defendant cannot establish prejudice. We conclude defendant cannot establish prejudice and thus we do not address the reasonableness of counsel's performance. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697 [80 L.Ed.2d at p. 699] ["If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed"].)

The victim's and S. T.'s statements to the police on the evening of the shooting were substantially similar. F. S. told the police someone driving a blue Chevy Tahoe

13

parked on 15th Street drove past him as he was riding his bicycle on 64th or 65th Avenue, reversed to pursue him, turned the car around, shot at him, and collided with another vehicle. The blue Chevy Tahoe was defendant's mother's car, which defendant had borrowed earlier that evening and returned damaged about an hour later. S. T. told the police: she was driving with defendant that evening, they drove past a truck, the man in the truck pulled out a bicycle and started to pedal away, defendant put the car in reverse to "catch" the man, after defendant turned the car around, he told S. T. to move out of the way and shot at the man across S. T.'s body, defendant then drove into another vehicle, left the scene, and drove to defendant's mother's house, where he took a shower and put the gun on top of the refrigerator.

F. S.'s and S. T.'s substantially similar police statements were corroborated by the police finding a spent bullet casing on the front passenger floorboard of defendant's mother's car, a .45-caliber gun on top of defendant's mother's refrigerator with the rounds therein matching the bullet casing in the car, and a damaged vehicle in the area where the shooting occurred. Defendant's flight from the scene of the vehicle accident, coupled with S. T.'s statement that defendant took a shower immediately after the incident, lead to the logical conclusion that defendant was seeking to avoid the police that evening and he was attempting to destroy evidence of the shooting.[3]

Based on the foregoing evidence, we conclude that, even if defendant's trial counsel should have objected to the gunshot residue evidence on hearsay grounds, there is no reasonable probability the outcome in this case would have been different. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 [to establish prejudice for an ineffective assistance of counsel claim, a defendant must show "a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been

---

[3] The jury was given flight and destruction of evidence instructions. Defendant does not challenge the propriety of those instructions.

14

different"].)  Thus, defendant suffered no prejudice and we conclude his ineffective assistance of counsel argument has no merit.

## III

### *The Trial Court Did Not Err In Finding*
### *The 1995 Conviction Constituted A Prior Strike*

Defendant contends his 1995 conviction was a juvenile adjudication and, as such, the trial court was required, among other things, to determine that he was over 16 years old at the time he committed the offense before the conviction could constitute a strike under section 667, subdivisions (a) and (d)(3)(A).  Defendant argues the trial court violated his Sixth and Fourteenth Amendment rights by impliedly finding he was over 16 years old at the time of the offense because defendant never admitted his age in the original plea and the record of conviction was devoid of such information.  Defendant further argues that, to the extent an objection to the trial court's determination of defendant's age at the time of the 1995 offense was required, his trial counsel was ineffective for failing to object.

The People disagree.  The People argue defendant's 1995 conviction was not a juvenile adjudication because defendant was sentenced in superior court, relying on *People v. Cole* (2007) 152 Cal.App.4th 230.  Thus, in the People's view, the fact that defendant was a juvenile at the time of his 1995 conviction is immaterial.  In reply, defendant asserts *Cole* is distinguishable because "the record [here] revealed no evidence that [defendant] was found 'unfit for handling in the juvenile court.' "

We agree with the People that defendant's 1995 conviction was not a juvenile adjudication.  Thus, we find no merit in defendant's argument.

### A

### *Background*

The prosecution introduced the following documents to prove defendant's 1995 conviction constituted a strike under section 667:  (1) the August 18, 1995, complaint

15

filed against defendant; (2) the November 30, 1995, Sacramento Superior Court abstract of judgment providing defendant pled guilty to and was convicted of assault with a firearm under section 245, subdivision (a)(2), and he admitted the firearm enhancement under section 12022.5 was true, resulting in a six-year sentence in state prison; (3) a minute order dated November 30, 1995; (4) minute orders for various dates in October 1995; and, (5) various documents from the Department of Corrections and Rehabilitation.

The trial court found the 1995 conviction constituted a strike within the meaning of section 667, subdivisions (a) through (i).

B

*The 1995 Conviction Was Not A Juvenile Adjudication*

Section 667, subdivision (d)(3), upon which defendant relies, provides: "A prior juvenile adjudication constitutes a prior serious or violent felony conviction for purposes of sentence enhancement if: [¶] (A) The juvenile was 16 years of age or older at the time the juvenile committed the prior offense. [¶] (B) The prior offense is listed in subdivision (b) of Section 707 of the Welfare and Institutions Code or described in paragraph (1) or (2) as a serious or violent felony. [¶] (C) The juvenile was found to be a fit and proper subject to be dealt with under the juvenile court law. [¶] (D) The juvenile was adjudged a ward of the juvenile court within the meaning of Section 602 of the Welfare and Institutions Code because the person committed an offense listed in subdivision (b) of Section 707 of the Welfare and Institutions Code." The plain language of the statute makes clear that this section applies only if the defendant previously had *a juvenile adjudication*.

Defendant's 1995 conviction was not a juvenile adjudication. First, as defendant concedes, although he was a juvenile at the time of the offense, defendant "was prosecuted in adult court for reasons that are not reflected in the record." The record of conviction shows the 1995 conviction was "a finding of criminal guilt in adult criminal court" not "a declaration of wardship by a juvenile court." (*People v. Smith* (2003) 110

16

Cal.App.4th 1072, 1080 [discussing differences between adult convictions and juvenile adjudications].) Second, juvenile adjudications are generally not convictions, and defendant sustained a conviction in 1995. (See *People v. Thurston* (2016) 244 Cal.App.4th 644, 662, citing Welf. & Inst. Code, § 203 [" 'An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding' "].) Third, defendant served his six-year sentence for the 1995 conviction in state prison under the supervision of the Department of Corrections and Rehabilitation; he was not committed to the California Youth Authority.[4] Because defendant's 1995 conviction was not a juvenile adjudication, section 667, subdivision (d)(3), is inapplicable.

To the extent defendant argues that, based on *Cole*, for the 1995 conviction to constitute a strike under section 667, the trial court first had to find defendant was found unfit for handling in the juvenile court, we disagree. (See *People v. Cole*, *supra*, 152 Cal.App.4th at p. 237 [stating, "if the minor is found unfit for handling in the juvenile court and is found in adult court to have committed a serious or violent felony, that felony is a strike"].) *Cole* did not consider and is, therefore, not authority for the proposition that, where the record of conviction reveals a defendant suffered an adult conviction as a minor, a court must find the defendant was unfit for handling in the juvenile court before it may find that prior adult conviction qualifies as a strike offense. (*In re Chavez* (2003) 30 Cal.4th 643, 656 [a case is not authority for propositions not

---

**4** Pursuant to post-1995 amendments to the Welfare and Institutions Code, the Youth Authority is now known as the Division of Juvenile Justice in the Department of Corrections and Rehabilitation. (Welf. & Inst. Code, § 1703, subd. (c); Gov. Code, § 12838.5.)

considered and decided].) We find no basis for imposing such a requirement not otherwise specified in section 667.

In light of our conclusion, we do not address defendant's alternative argument that his trial counsel was ineffective for failing to object to the trial court's purported "post-hoc judicial fact-finding regarding [defendant's] age at the time of his juvenile conviction." (Bolding and capitalization omitted.)

## IV

### *There Was No Cumulative Error*

Defendant argues the cumulative effect of the errors in this case deprived him of due process and a fair trial in violation of his federal and state constitutional rights. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we concluded defendant did not receive ineffective assistance of counsel and his 1995 conviction properly constituted a strike, there was no cumulative error.

## V

### *The One-Year Enhancement Is Stricken*

Defendant argues the one-year enhancement imposed under section 667.5 must be stricken because the allegation was dismissed prior to judgment, the prosecution produced no evidence regarding the truth of the prior conviction, and, alternatively, the enhancement can no longer be imposed in light of Senate Bill No. 136 (2019-2020 Reg. Sess.). The People concede the one-year enhancement should be stricken because the prior conviction allegation supporting the enhancement was dismissed prior to judgment. The record confirms this fact. We accordingly accept the People's concession and strike the one-year enhancement.

## DISPOSITION

The judgment is modified to strike the one-year enhancement imposed under section 667.5, subdivision (b).  The trial court is directed to amend the abstract of judgment to reflect this change and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


/s/
Robie, J.


We concur:


/s/
Hull, Acting P. J.


/s/
Renner, J.

19